Approved: _____
          Amanda Houle / Matthew Laroche
          Jason A. Richman / Kyle Wirshba
          Assistant United States Attorneys

Before:   HONORABLE ONA T. WANG
          United States Magistrate Judge
          Southern District of New York

**20 MAG 5469**

- - - - - - - - - - - - - - - - - x
                                  :
UNITED STATES OF AMERICA          :     **COMPLAINT**
                                  :
        - v. -                    :     Violations of
                                  :     18 U.S.C. §§ 924, 2;
ADEL EL ZABAYAR,                  :     21 U.S.C. §§ 960a, 963
                                  :
                Defendant.        :     COUNTY OF OFFENSE:
                                  :     NEW YORK
- - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

        MATTHEW S. PASSMORE, being duly sworn, deposes and says
that he is a Special Agent with the Drug Enforcement Administration
("DEA") and charges as follows:

COUNT ONE
Narco-Terrorism Conspiracy

        1.   From at least in or about 1999, up to and including
in or about 2020, in an offense begun and committed out of the
jurisdiction of any particular State or district of the United
States, including in Venezuela, Colombia, Mexico, Iran, Syria,
Lebanon, and elsewhere, ADEL EL ZABAYAR, the defendant, and others
known and unknown, at least one of whom has been first brought to
and arrested in the Southern District of New York, intentionally
and knowingly combined, conspired, confederated, and agreed
together and with each other to violate Title 21, United States
Code, Section 960a.

        2.   It was a part and an object of the conspiracy that
ADEL EL ZABAYAR, the defendant, and others known and unknown, would
and did engage in conduct that would be punishable under Title 21,
United States Code, Section 841(a) if committed within the

jurisdiction of the United States, to wit, the distribution of, and possession with the intent to distribute, five kilograms and more of mixtures and substances containing a detectable amount of cocaine, knowing and intending to provide, directly and indirectly, something of pecuniary value to a person and organization that has engaged and engages in terrorism and terrorist activity, to wit, the *Fuerzas Armadas Revolucionarias de Colombia* ("FARC") (which has been designated by the United States Secretary of State as a foreign terrorist organization pursuant to Section 219 of the Immigration and Nationality Act and remains so designated) and its members, operatives, and associates, having knowledge that such organization and persons have engaged and engage in terrorism and terrorist activity, in violation of Title 21, United States Code, Section 960a.

(Title 21, United States Code, Section 960a; and
Title 18, United States Code, Section 3238.)

COUNT TWO
(Cocaine Importation Conspiracy)

3.    From at least in or about 1999, up to and including in or about 2020, in an offense begun and committed out of the jurisdiction of any particular State or district of the United States, including in Venezuela, Colombia, Mexico, Iran, Syria, Lebanon, and elsewhere, ADEL EL ZABAYAR, the defendant, and others known and unknown, at least one of whom has been first brought to and arrested in the Southern District of New York, intentionally and knowingly combined, conspired, confederated, and agreed together and with each other to violate the narcotics laws of the United States.

4.    It was a part and an object of the conspiracy that ADEL EL ZABAYAR, the defendant, and others known and unknown, would and did import into the United States and into the customs territory of the United States from a place outside thereof a controlled substance, in violation of Title 21, United States Code, Sections 952(a) and 960(a)(1).

5.    It was further a part and an object of the conspiracy that ADEL EL ZABAYAR, the defendant, and others known and unknown, would and did manufacture, distribute, and possess with intent to distribute a controlled substance, intending, knowing, and having reasonable cause to believe that such substance would be unlawfully imported into the United States and into waters within a distance of 12 miles of the coast of the United States, in violation of Title 21, United States Code, Sections 959(a) and 960(a)(3).

6.    It was further a part and an object of the conspiracy that ADEL EL ZABAYAR, the defendant, and others known and unknown, would and did, on board an aircraft registered in the United States, manufacture, distribute, and possess with intent to distribute a controlled substance, in violation of Title 21, United States Code, Sections 959(c) and 960(a)(3).

7.    The controlled substance that ADEL EL ZABAYAR, the defendant, conspired to (i) import into the United States and into the customs territory of the United States from a place outside thereof, (ii) manufacture and distribute, intending, knowing, and having reasonable cause to believe that such substance would be unlawfully imported into the United States and into waters within a distance of 12 miles of the coast of the United States from a place outside thereof, and (iii) manufacture, distribute, and possess on board an aircraft registered in the United States, was five kilograms and more of mixtures and substances containing a detectable amount of cocaine, in violation of Title 21, United States Code, Section 960(b)(1)(B).

(Title 21, United States Code, Section 963; and
Title 18, United States Code, Section 3238.)

<u>COUNT THREE</u>
(Possession of Machineguns and Destructive Devices)

8.    From in or about 1999 up to and including in or about 2020, in Venezuela, Colombia, Mexico, Iran, Syria, Lebanon, and elsewhere, and in an offense begun and committed out of the jurisdiction of any particular state or district of the United States and for which one of two or more joint offenders has been first brought to and arrested in the Southern District of New York, ADEL EL ZABAYAR, the defendant, during and in relation to a drug trafficking crime for which he may be prosecuted in a court of the United States, to wit, the controlled substance offenses charged in Counts One and Two of this Complaint, knowingly used and carried firearms, and, in furtherance of such crime, knowingly possessed firearms, and aided and abetted the use, carrying, and possession of firearms, to wit, machineguns that were capable of automatically shooting more than one shot, without manual reloading, by a single function of the trigger, as well as destructive devices.

(Title 18, United States Code, Sections 924(c)(1)(A),
924(c)(1)(B)(ii), 3238, and 2.)

COUNT FOUR
(Conspiracy to Possess Machineguns and Destructive Devices)

9.   From at least in or about 1999, up to and including in or about 2020, in an offense begun and committed out of the jurisdiction of any particular State or district of the United States, including in Venezuela, Colombia, Mexico, Iran, Syria, Lebanon, and elsewhere, ADEL EL ZABAYAR, the defendant, and others known and unknown, at least one of whom has been first brought to and arrested in the Southern District of New York, intentionally and knowingly combined, conspired, confederated, and agreed together and with each other to violate Title 18, United States Code, Section 924(c).

10.   It was a part and object of the conspiracy that ADEL EL ZABAYAR, the defendant, and others known and unknown, would and did, during and in relation to a drug trafficking crime for which they may be prosecuted in a court of the United States, to wit, the controlled substance offenses charged in Counts One and Two of this Complaint, would and did use and carry firearms, and, in furtherance of such drug trafficking crime, knowingly possess firearms, including machineguns that were capable of automatically shooting more than one shot, without manual reloading, by a single function of the trigger, as well as destructive devices, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(i) and 924(c)(1)(B)(ii).

(Title 18, United States Code, Sections 924(o) and 3238.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

11.   I am a Special Agent with the DEA.  This affidavit is based upon my conversations with law enforcement officers and employees, my conversations with the witnesses described herein, as well as a review of documents, during the course of the investigation.  Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of the investigation.  Where the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

*Overview*

12.   Since in or about 2006, the U.S. Attorney's Office for the Southern District of New York and Bilateral Investigations Unit of the DEA's Special Operations Division have been

4

investigating high-ranking public officials in Venezuela and elsewhere, who have participated in, among other things, narco-terrorism, large scale drug trafficking, and weapons offenses relating to the importation of cocaine into the United States.

13.   The investigation to date has shown that members of a Venezuelan state-sponsored drug-trafficking cartel known as the "*Cártel de Los Soles*," including former Venezuelan president Nicolás Maduro Moros, have worked for over two decades with the FARC, which is a designated Foreign Terrorist Organization, and other terrorist groups to enrich themselves through drug trafficking and to use cocaine as a weapon against the United States.

14.   ADEL EL ZABAYAR, the defendant, was a member of the Venezuelan National Assembly and is a member of the *Cártel de Los Soles*.  As a member of the *Cártel*, EL ZABAYAR has, among other things, participated in weapons-for-cocaine negotiations with the FARC, obtained anti-tank rocket launchers from the Middle East for the FARC as partial payment for cocaine, and recruited terrorists from Hizballah and Hamas, which are also designated Foreign Terrorist Organizations, for the purpose of helping to plan and organize attacks against United States interests.  During the course of EL ZABAYAR's activities on behalf of the *Cártel de Los Soles*, EL ZABAYAR also acted as a liaison between the Venezuelan government and Syrian president Bashar Hafez al-Assad, fought in Syria on behalf of Assad's Hizballah-backed forces in or about 2013, and appeared in at least two interviews released by Al Manar, Hizballah's terrorist-designated propaganda arm, in or about 2013 and 2014.

### *The Cártel de Los Soles*

15.   Based on my participation in this investigation, conversations with witnesses and law enforcement personnel, and review of documents, including superseding indictment S2 11 Cr. 205 (AKH) (the "Indictment"), which was unsealed on March 26, 2020 and is attached as Exhibit A and incorporated by reference, I know, among other things, the following:

a.   From at least in or about 1999, up to and including in or about 2020, the *Cártel de Los Soles* was comprised of high-ranking Venezuelan officials who abused the Venezuelan people and corrupted the legitimate institutions of Venezuela -- including parts of the military, intelligence apparatus, legislature, and the judiciary -- to facilitate the importation of tons of cocaine into the United States.  *See* Indictment ¶¶ 1-6.

b. Maduro Moros, the former President of Venezuela and current *de facto* leader of the country, Diosdado Cabello Rondón, the president of Venezuela's National Constituent Assembly, and Hugo Armando Carvajal Barrios, the former head of Venezuela's military intelligence agency, have played leadership roles in the *Cártel de Los Soles*. *See* Indictment ¶¶ 4, 7-9.

c. Under the leadership of Maduro Moros, Cabello Rondón, Carvajal Barrios, and others, the *Cártel de Los Soles* sought not only to enrich its members and enhance their power, but also to "flood" the United States with cocaine and inflict the drug's harmful and addictive effects on users in this country. Thus, whereas most drug-trafficking organizations in South and Central America have sought to recede from their roles in importing narcotics into the United States in an effort to avoid U.S. prosecution, the *Cártel de Los Soles,* under the leadership of Maduro Moros, Cabello Rondón, Carvajal Barrios, and others, prioritized using cocaine as a weapon against America and importing as much cocaine as possible into the United States. *See* Indictment ¶ 4.

## *The Designated Foreign Terrorist Organizations*

d. Between at least in or about 1999, up to and including in or about 2020, the FARC became one of the largest producers of cocaine in the world. *See* Indictment ¶ 11. The FARC has also directed violent acts against United States persons and property in foreign jurisdictions, including, but not limited to, Colombia. For example, the FARC leadership ordered FARC members to kidnap and murder United States citizens and to attack United States interests in order to dissuade the United States from continuing its efforts to fumigate FARC coca fields and disrupt the FARC's manufacturing and distribution of cocaine and cocaine paste. On or about October 8, 1997, the U.S. Secretary of State designated the FARC as a foreign terrorist organization pursuant to Section 219 of the Immigration and Naturalization Act ("INA"), and the FARC remains so designated.

e. Hamas, also known as Harakat al-Muqawamah al-Islamiyya and the Islamic Resistance Movement, among other names, was established in or about 1987 at the onset of the first Palestinian uprising, or intifada, as an outgrowth of the Palestinian branch of the Muslim Brotherhood. One component of Hamas, the Izz al-Din al Qassam Brigades, has conducted anti-Israel attacks, including suicide bombings against civilian targets inside Israel. Through its attacks, Hamas has killed and injured United States citizens. On or about October 8, 1997, the

U.S. Secretary of State designated Hamas as a foreign terrorist organization pursuant to Section 219 of the INA, and Hamas remains so designated.

       f.  Hizballah is a Lebanon-based Shia Islamic organization with political, social, and terrorist components. Hizballah was founded in the early 1980s with support from Iran after the 1982 Israeli invasion of Lebanon, and its mission includes establishing a fundamentalist Islamic state in Lebanon. In 1997, the U.S. Secretary of State designated Hizballah a Foreign Terrorist Organization, pursuant to Section 219 of the INA, and it remains so designated today.  In 2001, pursuant to Executive Order 13,224, the U.S. Department of the Treasury, Office of Foreign Asset Control ("OFAC") designated Hizballah a Specially Designated Global Terrorist entity.  In 2010, State Department officials described Hizballah as the most technically capable terrorist group in the world, and a continued security threat to the United States.

       g.  The Islamic Jihad Organization ("IJO"), which is also known as the External Security Organization and "910," is a highly compartmentalized component of Hizballah responsible for the planning, preparation, and execution of intelligence, counterintelligence, and terrorist activities on behalf of Hizballah outside of Lebanon.  The IJO is responsible for terrorist attacks that have killed hundreds, including the 1983 bombing of the United States Marine barracks in Lebanon, which killed 241 Marines.  IJO operatives have also conducted attack planning operations in the United States.  In May 2019, IJO operative Ali Kourani was convicted at trial in this District of providing material support to Hizballah, receiving military-type training from Hizballah, and related weapons, sanctions, and immigration offenses.  Between 2002 and 2015, Kourani conducted a variety of IJO operations aimed at preparing for potential future Hizballah attacks in the United States.[1]

---

[1] These covert activities included searching for weapons suppliers in the United States who could provide firearms to support IJO operations; identifying individuals affiliated with the Israeli Defense Force whom the IJO could either recruit or target for violence; conducting pre-attack surveillance at U.S. military and law enforcement facilities in New York City; and collecting information regarding operations and security at airports in the United States and elsewhere.  Kourani also traveled to China on behalf of the IJO in 2009 to assist the IJO in obtaining ammonium nitrate to be used as an explosive precursor chemical.

h.   Hizballah's IJO has also conducted deadly attacks in South America, focused on the tri-border area of Argentina, Paraguay, and Brazil.  For example, in or about 1992, IJO operatives bombed the Israeli Embassy in Argentina, killing 29 people.  In or about 1994, IJO operatives bombed a Jewish cultural center in Buenos Aires, Argentina, killing 85 people and injuring hundreds.  More recently, the IJO has dispatched operatives to South and Central America to conduct surveillance and pre-attack planning.  For example, in or about June 2017, a now-cooperating witness ("CW-1") was arrested in connection with charges in this District for providing material support to Hizballah and related offenses.[2]  As part of his operational activity for the IJO, CW-1 traveled to South and Central America to both conduct training and pre-attack surveillance.  On two occasions, in or about 2011 and 2012, CW-1 traveled to Panama to surveil locations such as the Israeli Embassy and the Panama Canal for attack planning purposes.  The IJO operatives who were responsible for CW-1's training and tasking told CW-1 that other IJO operatives would be responsible for obtaining explosive material in Panama for potential future attacks.

i.   Similarly, in or about November 2014, Peruvian authorities arrested Mohammad Hamdar in Lima, Peru, and charged Hamdar with terrorist activities on behalf of the IJO.  In or about November 2016, Hamdar was designated a Specially Designated Global Terrorist by OFAC, pursuant to Executive Order 13,224.  In connection with this designation, OFAC explained that Hamdar confessed to membership in the IJO after his arrest.  OFAC further detailed that Peruvian authorities had searched an apartment associated with Hamdar and found in the apartment, among other things, photographs of popular tourist destinations and military grade explosives, and found in the garbage outside of the apartment explosives, gunpowder, and detonators.

j.   Al Manar is a media organization controlled by Hizballah. Al Manar employs Hizballah personnel, supports Hizballah fundraising and recruitment, and at least one Al Manar employee engaged in operational surveillance activities on Hizballah's behalf under cover of employment by Al Manar.  In 2006, pursuant to Executive Order 13,224, OFAC designated Al Manar a Specially Designated Global Terrorist entity.

---

[2] CW-1 pled guilty to a number of terrorism-related offenses pursuant to a cooperation agreement with the Government.  Information provided by CW-1 has proven to be reliable in that it has been corroborated in part by, among other things, documentary and electronic evidence.

k.    Hizballah    has    supported    Syrian    president
Bashar al-Assad's repressive regime in the Syrian Civil War.   In
or about 2011, thousands of Syrians publicly protested government
corruption, and the Assad regime responded with a ruthless campaign
of arbitrary arrests, detentions, torture, forced disappearances,
and violence.   Hizballah has directly supported these activities
by, among other things, deploying approximately thousands of
Hizballah members to fight on behalf of the Assad regime; training
pro-Assad militia groups; and supplying the Assad regime with
military-grade weapons, such as ballistic missiles.   While
Hizballah initially denied its involvement in the Syrian Civil
War, in or about May 2013, the Secretary General of Hizballah,
Hassan Nasrallah, publicly confirmed that Hizballah members were
fighting in Syria in support of the Assad regime and in opposition
to the United States and Israel's influence in the region.

### *The Narco-Terrorism Conspiracy*

l.    To achieve the objective of "flooding" the
United States with cocaine and other goals, the *Cártel de Los
Soles*, including Maduro Moros, Cabello Rondón, Carvajal Barrios,
ADEL EL ZABAYAR, the defendant, and others, conspired with and
sought support from the FARC (*see* Indictment ¶¶ 2, 5), Hizballah,
and Hamas.

m.    Among other things, Maduro Moros, Cabello
Rondón, Carvajal Barrios, and other members of the *Cártel de Los
Soles* negotiated multi-ton shipments of FARC-produced cocaine;
directed that the *Cártel de Los Soles* provide military-grade
weapons to the FARC; coordinated foreign affairs with Honduras and
other countries to facilitate large-scale drug trafficking; and/or
solicited   assistance   from   FARC   leadership   in   training   an
unsanctioned militia group that functioned, in essence, as an armed
forces unit for the *Cártel de Los Soles*.   *See* Indictment ¶5.

n.    In or about 2006, the *Cártel de Los Soles*
dispatched a 5.6-ton cocaine shipment from Venezuela on a DC-9 jet
bearing a United States registration number.   Cabello Rondón and
Carvajal Barrios worked with other members of the *Cártel de Los
Soles* to coordinate the shipment.   The jet departed Venezuela from
Simón Bolívar International Airport in Maiquetía, Venezuela (the
"Maiquetía Airport"), and landed at Ciudad del Carmen Airport in
Campeche, Mexico.   Mexican authorities seized the 5.6 tons of
cocaine when it arrived in Campeche.   *See* Indictment ¶ 15(d).

o.    In or about 2009, Carvajal Barrios and Tareck
Zaidan El Aissami Maddah ("El Aissami"), who was at the time a

senior official in Venezuela's Ministry of the Interior and Justice,[3] traveled to Iran and Syria on behalf of Hugo Chávez, then the president of Venezuela. In Syria, Carvajal Barrios and El Aissami met Ghazi Nasr al Din[4] and a Hizballah operative, and El Aissami proposed that Hizballah personnel travel to Venezuela to work with the FARC. The Hizballah operative gave three rifles to El Aissami during the trip, and El Aissami gave one of the weapons to Carvajal.[5]

        p. Also in or about 2009, Chávez visited the Middle East, including Syria and Iran, with a delegation that

---

[3] Based on my review of publicly available reports, court documents, and my conversations with others, I know that, between approximately January 2017 and June 2018, El Aissami served as the purported Executive Vice President of Venezuela. In or about June 2018, Maduro Moros named El Aissami the Venezuelan Minister of Industry and National Production, a position that he held until his appointment as Venezuela's Minister of Petroleum in or about April 2020. El Aissami is charged in this District with, among other things, conspiring to commit money laundering and conspiring to violate the International Emergency Economic Powers Act, Venezuelan Sanctions Regulations, the Foreign Narcotics Kingpin Designation Act, and Kingpin Act Regulations. *See* S5 19 Cr. 144 (AKH).

[4] In or about June 2008, OFAC designated al Din as a Specially Designated Global Terrorist, pursuant to Executive Order 13,224. In connection with the announcement, OFAC explained: "al-Din is a Venezuela-based Hizballah supporter who has utilized his position as a Venezuelan diplomat and the president of a Caracas-based Shi'a Islamic Center to provide financial support to Hizballah. Nasr al Din served until recently as Charge d' Affaires at the Venezuelan Embassy in Damascus, Syria, and was subsequently appointed the Director of Political Aspects at the Venezuelan Embassy in Lebanon."

[5] According to a *New York Times* article regarding the facts described in paragraph 15(o), Carvajal showed a reporter passport entries corroborating his travel to Iran and Syria in or about 2009, as well as the rifle from Hizballah that El Aissami gave to him. The article states that Carvajal claimed that he expressed "objections" to Maduro "regarding the plan to invite Hizballah to Venezuela," but that Maduro, who was Venezuela's foreign minister at the time, "favored antagonizing the United States" and "seemed positive about the proposal."

included EL ZABAYAR.  As of the date of the filing of this
Complaint, the public profile photograph for EL ZABAYAR's Twitter
account (the "Zabayar Twitter Account") depicts EL ZABAYAR shaking
Chávez's hand next to al-Assad during the trip (the "Zabayar-
Chávez-Assad Photograph"):



        q.   In or about 2011, EL ZABAYAR was interviewed
by Hizballah's Al Manar terrorist propaganda component.  Also in
or about 2011, a YouTube account bearing the name "Adel El Zabayar"
with the Zabayar-Chávez-Assad Photograph as its profile picture
(the "Zabayar YouTube Account"), posted a video of Al Manar's 2011
interview.  A still image from the interview, bearing Al Manar's
logo, is set forth below:



        r.   During the 2011 Interview, EL ZABAYAR said, in
substance and in part, the following:  (i) it is important to
support the Assad regime to counter the "global Zionist lobby,"
which influences the United States; (ii) the September 11, 2001
attacks were planned by "Zionists" to start a global conflict; and
(iii) Hizballah should be praised for defeating Israel in the
Middle East.[6]  I know, based on my training and experience, that
the term "Zionist" is used to refer to a follower of Zionism, a
movement that advocated for the establishment and development of
the state of Israel, and that the term Zionist is at times used as
a derogatory term by enemies of Israel.

        s.   In or about September 2013, months after
Maduro Moros succeeded to the Venezuelan presidency, the *Cártel de
Los Soles* dispatched 1.3 tons of cocaine on a commercial flight
from the Maiquetía Airport to Paris-Charles de Gaulle Airport.
French authorities seized the cocaine.  Following the seizure,
Maduro Moros cancelled a trip to attend a session of the United
Nations General Assembly in New York, citing to the media purported
death threats against him.  In Venezuela, Maduro Moros convened a
meeting with, among others, Cabello Rondón and Carvajal.  During

---

[6] The interview was conducted in Arabic.  English language
translations provided herein are based on draft summary
translations that are subject to change.

the meeting, Maduro Moros told Cabello Rondón and Carvajal Barrios, in substance and in part, that they should not have used the Maiquetía Airport for drug trafficking after the 2006 seizure in Mexico, and that the *Cártel de Los Soles* should instead use its other well-established drug routes and locations to dispatch cocaine.  *See* Indictment ¶ 15(i).

       t.   In or about August 2013, EL ZABAYAR took leave from his position in the Venezuelan National Assembly for the express purpose of traveling to Syria to fight with supporters of the Assad regime in connection with the Syrian Civil War. Approximately one month later, the following photograph of EL ZABAYAR and two other men in Syria, holding what appear to be AK-47s or similar assault rifles, was released to the media:



       u.   In or about September 2013, Maduro Moros gave a speech during which he, in substance and in part, described EL ZABAYAR as a "close friend," showed the foregoing picture of EL ZABAYAR, and praised EL ZABAYAR for fighting in Syria on behalf of the Assad regime.  Also in or about September 2013, a Twitter account bearing the name of Maduro Moros (the "Maduro Twitter Account") retweeted a Twitter post in which EL ZABAYAR reported: "This is one of the battlefronts.  The last trench is behind us. Fierce battles were fought here days ago."  The Maduro Twitter

Account post also included the following photograph of EL ZABAYAR (circled) and others in Syria holding what appear to be AK-47s:



      v.   On or about October 4, 2013, the Zabayar YouTube Account posted a video, a still image of which is depicted below, of an individual firing a rocket propelled grenade launcher (circled).  The caption of the video read "Deputy Adel El Zabayar firing an RPG7 missile" and the Zabayar YouTube Account commented on the video,  "In training with the Syrian resistance brigades against the empire."[7]

---

[7] Unless otherwise indicated, content from the Zabayar YouTube Account, the Zabayar Twitter Account, and the Zabayar Facebook Account was originally posted in Spanish. English language translations provided herein are based on draft summary translations that are subject to change.



w.   EL ZABAYAR returned to the Venezuelan National Assembly and was welcomed by a standing ovation, in video footage released on the Internet, in or about October 2013.

x.   In or about 2014, Hizballah's Al Manar terrorist propaganda component interviewed EL ZABAYAR.  During the interview, El ZABAYAR said, in substance and in part, that the "original Zionist conspiracy" had "financed Hitler" before World War II.  A still image from the interview bearing Al Manar's logo is set forth below



y.   In or about 2015, Efrain Campo Flores and Franqui Francisco Flores de Freitas -- two relatives of Maduro Moros -- agreed during recorded meetings with DEA confidential sources to dispatch multi-hundred-kilogram cocaine shipments from a hanger controlled by Maduro Moros at the Maiquetía Airport (the "Presidential Hangar").  During recorded meetings with the sources, Campo Flores and Flores de Freitas explained that they

were at "war" with the United States, described the *Cártel de Los Soles*, discussed a connection to a "commander for the FARC" who was "supposedly high-ranked," and indicated that they were seeking to raise $20 million in drug proceeds to support a campaign by the First Lady of Venezuela and Maduro Moros's wife in connection with a late-2015 election for the Venezuelan National Assembly.  *See* Indictment ¶ 15(n).[8]

### The Defendant Obtained Rocket Launchers for the FARC and Recruited Terrorists In Furtherance of the Conspiracy

16.  Based on my review of documents and my conversations with other law enforcement officers and a confidential source ("CS-1"),[9] I have learned, among other things, the following:

a.  ADEL EL ZABAYAR, the defendant, is of Syrian descent and is closely associated to several members of the *Cártel de Los Soles*, including Maduro Moros and Cabello Rondón, as well as El Aissami.

b.  In or about 2014, CS-1 was present for approximately three meetings held in Cabello Rondón's private office at Fuerte Tiuna, a military base in Caracas, Venezuela. The meetings included Cabello Rondón, EL ZABAYAR, El Aissami, and CS-1.  During the meetings, Cabello Rondón, in substance and in part, directed EL ZABAYAR to travel to Syria and Palestine to (i) obtain weapons, and (ii) recruit members of Hizballah and Hamas to train at clandestine training camps located in Venezuela. Cabello Rondón explained, in substance and in part, that the purpose of recruiting members of Hizballah and Hamas to train in Venezuela was to create a large terrorist cell capable of attacking United States interests on behalf of the *Cártel de Los Soles*.  EL

---

[8] In November 2016, Campo Flores and Flores de Freitas were convicted at trial in this District of conspiring to import cocaine into the United States.

[9] Since in or about 2014, CS-1 has been providing information and assistance to the DEA in exchange for monetary compensation, including living expenses, and also in an effort to earn a cooperation agreement and, ultimately, leniency at sentencing. Information CS-1 has provided to the DEA has proven to be reliable and been corroborated in part by, among other things, information provided by other witnesses and documentary evidence.

ZABAYAR agreed to travel to Syria and Palestine for the purposes Cabello Rondón described.

c.    While EL ZABAYAR was in the Middle East, Maduro Moros and EL ZABAYAR spoke on a call that CS-1 overheard because Maduro Moros conducted the call on speaker phone while CS-1 was present.  During the call, Maduro Moros, in substance and in part, congratulated EL ZABAYAR for his work fighting the United States in the Middle East, which CS-1 understood to be a reference to EL ZABAYAR traveling to Syria and Palestine to obtain weapons and recruit terrorists for the *Cártel de Los Soles*.

d.    EL ZABAYAR returned to Venezuela after spending several months in the Middle East in or about 2014. Approximately one week after EL ZABAYAR returned, EL ZABAYAR, Cabello Rondón, and CS-1 traveled together to the Maiquetía Airport.  When they arrived at the Maiquetía Airport, the men went to the Presidential Hangar, which the *Cártel de Los Soles* used for drug-trafficking activities in 2006, 2013, and 2015, as described above.  *See supra* ¶¶ 15(n), 15(s), 15(y).  At the Presidential Hangar, the men received a Lebanese cargo plane that was full of weapons, including rocket-propelled grenade launchers, AK-103s, and sniper rifles, that EL ZABAYAR had obtained while he was in the Middle East, as Cabello Rondón had directed.

e.    Later, also in or about 2014, CS-1 was present for a meeting at the Miraflores Palace, the presidential palace located in Caracas, Venezuela, that was attended by, among others, Maduro Moros, Cabello Rondón, El Aissami, and EL ZABAYAR.  During that meeting, the men discussed, among other things, and in substance and in part, arranging a meeting between the leaders of the FARC and the leaders of Hizballah and Hamas.

f.    Also in or about 2014, EL ZABAYAR posted several messages in support of Hamas to the Zabayar Twitter Account, including the following:

i.    On or about August 21, 2014, EL ZABAYAR posted a message stating, in substance and in part, that a "leader from Hamas" had been "murdered" by Israel.  In another posting on the same date, EL ZABAYAR referred to one of the "martyred leaders from HAMAS" and his "search for FREEDOM."  Based on my review of open source material, I know that, on or about August 21, 2014, Israel conducted an airstrike in Gaza that killed three high-ranking members of the Izz al-Din al Qassam Brigades, which, as noted above, *see supra* ¶ 15(e), is an armed component of Hamas

that has conducted suicide bombings against civilian targets inside Israel.

        ii.    Also on or about August 21, 2014, EL ZABAYAR posted a message stating, in substance and in part, "We are warning you. While negotiations were going on in Egypt there was an ONGOING great conspiracy IN ORDER TO locate DAIF, the leader of the military branch of HAMAS AND TO ASSASSINATE HIM." Based on my review of open source material, I know that, on or about August 20, 2014, following a period of peace talks between Israel and Hamas in Egypt, Hamas claimed that Israel attempted to assassinate Muhammed Deif, the top commander of the Izz al-Din al Qassam Brigades.[10]

        17.    Based on my review of documents and my conversations with other law enforcement officers and a confidential source ("CS-2"),[11] I have learned, among other things, the following:

        a.    In or about 2014, CS-2 met with ADEL EL ZABAYAR, the defendant, Cabello Rondón, and others in Venezuela. During that meeting, Cabello Rondón said, in substance and in part, that he needed to give the FARC weapons as partial payment for cocaine the FARC had provided to the *Cártel de Los Soles*, and that the FARC wanted AT4s (anti-tank rocket launchers) in addition to AK-47s, but that Cabello Rondón could not obtain the AT4s for the FARC in Venezuela. In response, EL ZABAYAR agreed, in substance

---

[10] In or about September 2015, the U.S. State Department designated Deif as a Specially Designated Global Terrorist. In announcing the designation of Deif, the State Department said that Deif, as the top commander of the Izz al-Din al Qassam Brigades, was known for deploying suicide bombers and directing the kidnapping of Israeli soldiers. The State Department further described Deif as the "mastermind" behind Hamas's offensive strategy against Israel in 2014.

[11] Since in or about 2019, CS-2 has been providing information and assistance to the DEA in exchange for monetary compensation, including living expenses, and also in an effort to earn a cooperation agreement and, ultimately, leniency at sentencing. Information provided to the DEA by CS-2 has proven to be reliable and has been corroborated in part by, among other things, information provided by other witnesses and documentary evidence.

and in part, to obtain the AT4s for the FARC from his contacts in the Middle East.

b.   In or about 2014, CS-2 was present for a meeting at a military base in Guárico, Venezuela, along with, among others, EL ZABAYAR, Cabello Rondón, other Venezuelan military officials, and a FARC representative.  During the meeting, Cabello Rondón pointed to approximately two trucks parked nearby, and told the group, in substance and in part, that the weapons in the trucks were partial payment to the FARC for the "candy," which CS-2 understood to be a reference to cocaine the FARC had provided to the *Cártel de Los Soles*.  After the meeting, Cabello Rondón told another Venezuelan official in CS-2's presence that one of the trucks contained AT4s and AK-47s, while the other truck contained AK-47s and ammunition.

c.   Following the conclusion of the meeting at the base in Guárico in or about 2014, Cabello Rondón and CS-2 departed the base but EL ZABAYAR stayed behind.  Shortly thereafter, CS-2 obtained the following photograph, which had been posted on a Facebook account used by EL ZABAYAR's assistant (the "Assistant Account") and which showed EL ZABAYAR at the Base kneeling in front of a Venezuelan fighter jet.



d.    CS-2 also obtained a photograph from the Assistant Account, depicted below, of EL ZABAYAR (left), Maduro Moros (right), and Maduro Moros's wife and First Lady of Venezuela (center).



18.   Based on my training, experience, and participation in this investigation, and my conversations with other law enforcement officers, I know that AK-47s and AK-103s are designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.  I also know that AT4s and rocket-propelled grenade launchers are designed to have a rocket having a propellant charge of more than four ounces.

WHEREFORE, deponent respectfully requests that a warrant be issued for the arrest of ADEL EL ZABAYAR, the defendant, and that he be imprisoned or bailed, as the case may be.


s/ Matthew S. Passmore/oaw

MATTHEW S. PASSMORE
Special Agent
Drug Enforcement Administration

Cred. No. 9854


Sworn to me through the
transmission of this Affidavit
by reliable electronic means, pursuant to
Federal Rule of Criminal Procedure 4.1,
this 27th day of May, 2020

_____
THE HONORABLE ONA T. WANG
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

# EXHIBIT A

ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA                :

     - v. -                              :

                             :   **SUPERSEDING INDICTMENT**

NICOLÁS MADURO MOROS,                   :   S2 11 Cr. 205 (AKH)
DIOSDADO CABELLO RONDÓN,
HUGO ARMANDO CARVAJAL BARRIOS,          :
    a/k/a "El Pollo,"
CLÍVER ANTONIO ALCALÁ CORDONES,         :
LUCIANO MARÍN ARANGO,
    a/k/a "Ivan Marquez," and          :
SEUXIS PAUCIS HERNÁNDEZ SOLARTE,
    a/k/a "Jesús Santrich,"            :

               Defendants.          :

- - - - - - - - - - - - - - - - - - - X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: MAR 0 5 2020

## COUNT ONE
### (Narco-Terrorism Conspiracy)

The Grand Jury charges:

*Overview*

    1.    From at least in or about 1999, up to and including in or about 2020, NICOLÁS MADURO MOROS, DIOSDADO CABELLO RONDÓN, HUGO ARMANDO CARVAJAL BARRIOS, a/k/a "El Pollo," CLÍVER ANTONIO ALCALÁ CORDONES, LUCIANO MARÍN ARANGO, a/k/a "Ivan Marquez," and SEUXIS PAUCIS HERNÁNDEZ SOLARTE, a/k/a "Jesús Santrich," the defendants, participated in a corrupt and violent narco-terrorism conspiracy between the Venezuelan *Cártel de Los Soles* and the *Fuerzas Armadas Revolucionarias de Colombia* ("FARC").

2.    From at least in or about 1999, up to and including in or about 2020, the FARC was a terrorist organization -- led at times by LUCIANO MARÍN ARANGO, a/k/a "Ivan Marquez," and SEUXIS PAUCIS HERNÁNDEZ SOLARTE, a/k/a "Jesús Santrich," the defendants, among others -- that became one of the largest producers of cocaine in the world and perpetrated acts of violence against United States nationals and property.

3.    From at least in or about 1999, up to and including in or about 2020, the *Cártel de Los Soles*, or "Cartel of the Suns," was a Venezuelan drug-trafficking organization comprised of high-ranking Venezuelan officials who abused the Venezuelan people and corrupted the legitimate institutions of Venezuela -- including parts of the military, intelligence apparatus, legislature, and the judiciary -- to facilitate the importation of tons of cocaine into the United States.  The name of the *Cártel de Los Soles* is a reference to the sun insignias affixed to the uniforms of high-ranking Venezuelan military officials who are members of the Cartel.

4.    NICOLÁS MADURO MOROS, the defendant, helped manage and, ultimately, lead the *Cártel de Los Soles* as he gained power in Venezuela.  Under the leadership of MADURO MOROS and others, the *Cártel de Los Soles* sought not only to enrich its members and enhance their power, but also to "flood" the United States with

2

cocaine and inflict the drug's harmful and addictive effects on users in this country. Thus, whereas most drug-trafficking organizations in South and Central America have sought to recede from their roles in importing narcotics into the United States in an effort to avoid U.S. prosecution, the *Cártel de Los Soles*, under the leadership of MADURO MOROS and others, prioritized using cocaine as a weapon against America and importing as much cocaine as possible into the United States.

5. While pursuing these and other objectives, NICOLÁS MADURO MOROS, the defendant, negotiated multi-ton shipments of FARC-produced cocaine; directed that the *Cártel de Los Soles* provide military-grade weapons to the FARC; coordinated foreign affairs with Honduras and other countries to facilitate large-scale drug trafficking; and solicited assistance from FARC leadership in training an unsanctioned militia group that functioned, in essence, as an armed forces unit for the *Cártel de Los Soles*.

### The Cártel de Los Soles and the Venezuelan Defendants

6. At various times between 1999 and 2020, NICOLÁS MADURO MOROS, DIOSDADO CABELLO RONDÓN, HUGO ARMANDO CARVAJAL BARRIOS, a/k/a "El Pollo," and CLÍVER ANTONIO ALCALÁ CORDONES, the defendants, acted as leaders and managers of the *Cártel de Los Soles* and the narco-terrorism conspiracy with the FARC.

3

7.    NICOLÁS   MADURO   MOROS,   the   defendant,   is   a
Venezuelan citizen, was previously the president of Venezuela, and
is  now  the  *de  facto*  ruler  of  the  country.    MADURO  MOROS  also
previously held a seat in the Venezuelan National Assembly between
in  or  about  2000  and  in  or  about  2006,  acted  as  the  Venezuelan
foreign  minister  between  in  or  about  2006  and  in  or  about  2013,
and  acted  as  the  vice  president  of  Venezuela  in  or  about  2013.
MADURO  MOROS  succeeded  to  the  Venezuelan  presidency  after  Hugo
Chávez died in or about 2013 and, during his presidency, continued
to participate in cocaine trafficking with the *Cártel de Los Soles*
and  the  FARC.    In  or  about  2018,  MADURO  MOROS  declared  victory  in
a  presidential  election  in  Venezuela.    In  or  about  2019,  the
National Assembly of Venezuela invoked the Venezuelan constitution
and declared that MADURO MOROS had usurped power and was not the
president  of  Venezuela.    Since  in  or  about  2019,  more  than  50
countries,  including  the  United  States,  have  refused  to  recognize
MADURO  MOROS  as  Venezuela's  head  of  state  and  instead  recognized
Juan Guaidó as the interim president of Venezuela.    In or about
January 2020, the United States Department of State certified the
authority of Guaidó, as the interim president of Venezuela, to
receive  and  control  property  in  accounts  at  the  United  States
Federal  Reserve  maintained  by  the  Venezuelan  government  and  the
Central Bank of Venezuela.

8. DIOSDADO CABELLO RONDÓN, the defendant, is a Venezuelan citizen, president of Venezuela's National Constituent Assembly, and a member of the Venezuelan armed forces. CABELLO RONDÓN previously acted as chief of staff to Chávez in or about 2001, vice president of Venezuela in or about 2002, governor of Venezuela's Miranda State between in or about 2004 and in or about 2008, and president of Venezuela's National Assembly between in or about 2012 and in or about 2016.

9. HUGO ARMANDO CARVAJAL BARRIOS, a/k/a "El Pollo," the defendant, is a Venezuelan citizen and was the director of Venezuela's military intelligence agency, which was known as the *Dirección de Inteligencia Militar* ("DIM"), between in or about 2004 and in or about 2011. In or about 2013, NICOLÁS MADURO MOROS, the defendant, made CARVAJAL BARRIOS the director of the DIM for a second time. Between in or about January 2014 and in or about June 2014, CARVAJAL BARRIOS held the title of Venezuela's consul general to Aruba. In or about January 2016, despite being a fugitive on drug-trafficking charges that have been pending in the Southern District of New York since at least in or about 2011, CARVAJAL BARRIOS was elected to the Venezuelan National Assembly. As of the filing of this Superseding Indictment, CARVAJAL BARRIOS remains a fugitive on pending charges in underlying indictments in

the Southern District of New York and subject to a lawful order of extradition issued by Spain in or about 2019.

10.  CLÍVER ANTONIO ALCALÁ CORDONES, the defendant, is a Venezuelan citizen and a former general in the Venezuelan military.

*The FARC and the FARC Defendants*

11.  Between at least in or about 1999, up to and including in or about 2020, the FARC became one of the largest producers of cocaine in the world.  The FARC has also directed violent acts against United States persons and property in foreign jurisdictions, including, but not limited to, Colombia.  For example, the FARC leadership ordered FARC members to kidnap and murder United States citizens and to attack United States interests in order to dissuade the United States from continuing its efforts to fumigate FARC coca fields and disrupt the FARC's manufacturing and distribution of cocaine and cocaine paste.  Consistent with these activities, in or about 1997, the United States Department of State designated the FARC as a Foreign Terrorist Organization. The FARC remains so designated as of the filing of this Superseding Indictment.

12.  LUCIANO MARÍN ARANGO, a/k/a "Ivan Marquez," the defendant, is a Colombian citizen who joined the FARC in or about 1985.  In or about 2006, the United States Attorney's Office for

the Southern District of New York filed a drug-trafficking charge against 50 leaders of the FARC, including MARÍN ARANGO. As of the filing of this Superseding Indictment, MARÍN ARANGO is a fugitive on that charge and a member of the FARC's Secretariat, which is the FARC's highest leadership body.

13. SEUXIS PAUCIS HERNÁNDEZ SOLARTE, a/k/a "Jesús Santrich," the defendant, is a Colombian citizen who joined the FARC in or about 1991. As of the filing of this Superseding Indictment, HERNÁNDEZ SOLARTE is a member of the FARC's Central High Command, which is the FARC's second-highest leadership body.

*Means and Methods of the Narco-Terrorism Conspiracy*

14. In furtherance of the narco-terrorism conspiracy, at various times between in or about 1999 and in or about 2020, members of the conspiracy organized their drug-trafficking activities as follows:

a. Beginning in or about 1999, while the FARC was purporting to negotiate toward peace with the Colombian government, the FARC agreed with leaders of the *Cártel de Los Soles* to relocate some of its operations to Venezuela under the protection of the Cartel.

b. Members and associates of the FARC, operating under the leadership of LUCIANO MARÍN ARANGO, a/k/a "Ivan Marquez," and SEUXIS PAUCIS HERNÁNDEZ SOLARTE, a/k/a "Jesús Santrich," the

7

defendants, among others, cultivated coca leaves on farms in Colombia and Venezuela, such as in southwest Colombia and in the Serranía del Perijá mountain range that spans Colombia and Venezuela.

c.    The FARC and the *Cártel de Los Soles* dispatched processed cocaine from Venezuela to the United States via transshipment points in the Caribbean and Central America, such as Honduras.    By in or about 2004, the United States Department of State estimated that 250 or more tons of cocaine were transiting Venezuela per year.    The maritime shipments were shipped north from Venezuela's coastline using go-fast vessels, fishing boats, and container ships.    Air shipments were often dispatched from clandestine airstrips, typically made of dirt or grass, concentrated in the Apure State.

d.    In order to achieve safe passage for the large cocaine shipments transiting Venezuela, members and associates of the FARC and the *Cártel de Los Soles* paid bribes, which ultimately benefited NICOLÁS MADURO MOROS, DIOSDADO CABELLO RONDÓN, HUGO ARMANDO CARVAJAL BARRIOS, a/k/a "El Pollo," and CLÍVER ANTONIO ALCALÁ CORDONES, the defendants, among others, in exchange for, for example, access to commercial ports and data from air and maritime radar in Venezuela.    According to the United States Department of State, approximately 75 unauthorized flights

8

suspected of drug-trafficking activities entered Honduran airspace in 2010 alone, using what is known as the "air bridge" cocaine route between Venezuela and Honduras.

e.   MADURO   MOROS,   CABELLO   RONDÓN,   CARVAJAL BARRIOS, and ALCALÁ CORDONES coordinated with the FARC in furtherance of the narco-terrorism conspiracy in order to: transport and distribute these large cocaine shipments; benefit from, and cause others to participate in, the provision of heavily armed security to protect the cocaine shipments; cause large quantities of previously-seized cocaine to be sold to drug traffickers in exchange for millions of dollars; interfere with drug-trafficking investigations and pending criminal cases in Venezuela and elsewhere; and help provide the FARC with military-grade weapons, including machineguns, ammunition, rocket launchers, and explosives equipment.

*Acts in Furtherance of the Narco-Terrorism Conspiracy Between the Cártel de Los Soles and the FARC*

15.   In furtherance of the narco-terrorism conspiracy and to effect the illegal objects thereof, the following overt acts, among others, were committed:

a.   In or about 2003, an associate of the FARC and the *Cártel de Los Soles* paid SEUXIS PAUCIS HERNÁNDEZ SOLARTE, a/k/a

9

"Jesús Santrich," the defendant, $300,000 to help establish a FARC camp near Apure, Venezuela where the FARC could process cocaine.

       b.   In or about 2005, Chávez instructed NICOLÁS MADURO MOROS, the defendant, who was then a member of the Venezuelan National Assembly, and others, that Venezuelan judges who would not protect the FARC and its activities should be removed from their positions. That same year, the Venezuelan government largely terminated Venezuela's participation in bilateral counter-narcotics operations with the Drug Enforcement Administration ("DEA").

       c.   In or about 2006, Chávez made MADURO MOROS the foreign minister of Venezuela. During the same year, the FARC paid MADURO MOROS $5 million in drug proceeds, through a third party, in connection with a money-laundering scheme that was part of the narco-terrorism conspiracy. MADURO MOROS and others agreed to launder many millions of dollars from the FARC, including the $5 million, by purchasing palm oil extraction equipment from Malaysia with drug proceeds, which would be used to support the operation of African palm plantations in Apure that would appear legitimate. In connection with this scheme, in or about December 2006, Venezuela announced trade agreements with Malaysian firms relating to African palm oil extraction and crude oil exploration in Venezuela.

d.   In or about 2006, the *Cártel de Los Soles* dispatched a 5.6-ton cocaine shipment from Venezuela on a DC-9 jet bearing a United States registration number.   DIOSDADO CABELLO RONDÓN and HUGO ARMANDO CARVAJAL BARRIOS, a/k/a "El Pollo," the defendants, worked with other members of the *Cártel de Los Soles* to coordinate the shipment.   The jet departed Venezuela from Simón Bolívar International Airport in Maiquetía, Venezuela (the "Maiquetía Airport"), and landed at Ciudad del Carmen Airport in Campeche, Mexico.   Mexican authorities seized the 5.6 tons of cocaine when it arrived in Campeche.

e.   In or about 2008, Chávez, who was at that time the president of Venezuela and one of the leaders of the *Cártel de Los Soles*, agreed with LUCIANO MARÍN ARANGO, a/k/a "Ivan Marquez," the defendant, to use funds from the Venezuelan state-owned oil producer, Petróleos de Venezuela (PDVSA), to support the FARC's drug-trafficking and terrorist operations.

f.   In or about 2008, MADURO MOROS, CABELLO RONDÓN, and CARVAJAL BARRIOS attended a meeting with a FARC representative at which the attendees agreed that the *Cártel de Los Soles* would provide the FARC cash and weapons in exchange for increased cocaine production.   During the meeting, MADURO MOROS agreed to abuse his authority as foreign minister to ensure that

the border between Venezuelan and Colombia remained open to facilitate drug trafficking.

g.    In or about 2008, CABELLO RONDÓN, CARVAJAL BARRIOS, and CLÍVER ANTONIO ALCALÁ CORDONES, the defendant, held a meeting at which they agreed that ALCALÁ CORDONES would take on additional duties coordinating drug-trafficking activities by the *Cártel de Los Soles* and the FARC.

h.    In or about 2009, MADURO MOROS, CABELLO RONDÓN, and CARVAJAL BARRIOS attended a meeting with a FARC representative at which the attendees discussed a four-ton cocaine shipment that the FARC was prepared to transport to the *Cártel de Los Soles*.    CABELLO RONDÓN directed that the FARC deliver the cocaine to a particular location in Venezuela, where a jet would be waiting to transport the cocaine to Nicaragua for further shipment to Mexico and importation into the United States.    During the meeting, the group also discussed a recent coup d'état in Honduras, and CABELLO RONDÓN warned, in substance and in part, that the resulting instability could "fuck up the business." MADURO MOROS traveled to Honduras after the meeting, purporting to act as the Venezuelan foreign minister, in order to try to intervene on behalf of the *Cártel de Los Soles* so that events in Honduras would not disrupt the drug-trafficking activities of the narco-terrorism conspiracy.

12

i.  In  or  about  September  2013,  months  after
MADURO MOROS succeeded to the Venezuelan presidency, the *Cártel de
Los Soles* dispatched 1.3 tons of cocaine on a commercial flight
from  the  Maiquetía  Airport  to  Paris  Charles  de  Gaulle  Airport.
French  authorities  seized  the  cocaine.    Following  the  seizure,
MADURO  MOROS  cancelled  a  trip  to  attend  a  session  of  the  U.N.
General  Assembly  in  New  York,  citing  to  the  media  purported  death
threats  against  him.    In  Venezuela,  MADURO  MOROS  convened  a  meeting
with,  among  others,  CABELLO  RONDÓN  and  CARVAJAL  BARRIOS.    During
the meeting, MADURO MOROS told CABELLO RONDÓN and CARVAJAL BARRIOS,
in  substance  and  in  part,  that  they  should  not  have  used  the
Maiquetía  Airport  for  drug  trafficking  after  the  2006  seizure  in
Mexico,  and  that  the  *Cártel  de  Los  Soles*  should  instead  use  its
other  well-established  drug  routes  and  locations  to  dispatch
cocaine.

j.    In  or  about  September  2013,  shortly  after
French  authorities  seized  the  1.3-ton  cocaine  shipment  from  the
*Cártel de Los Soles*, MADURO MOROS and others authorized the arrests
of Venezuelan military officials in an effort to divert public and
law enforcement scrutiny from the participation in the shipment by
MADURO MOROS, CABELLO RONDÓN, and CARVAJAL BARRIOS.

k.    In  or  about  2014,  MADURO  MOROS  met  with  MARÍN
ARANGO  at  a  military  base  in  Caracas.    During  the  meeting,  MADURO

13

MOROS agreed to continue to provide weapons to the FARC and requested that the FARC help train an armed militia group in Venezuela. MADURO MOROS also told MARÍN ARANGO, in substance and in part, that the militia would not be associated with the Venezuelan government, which would afford plausible deniability to government officials for the militia's anticipated violence. MARÍN ARANGO agreed to help MADURO MOROS train the militia and later facilitated training for members of the militia near his FARC camp in Zulia State.

l.   In or about July 2014, Aruban authorities provisionally arrested CARVAJAL BARRIOS at the request of the United States.  In response, MADURO MOROS, CABELLO RONDÓN, and other members of the *Cártel de Los Soles* pressured Aruba and the Dutch government to release CARVAJAL BARRIOS, including by reportedly deploying Venezuelan naval assets toward Aruba.  Aruba released CARVAJAL BARRIOS, and he returned to the protection of the *Cártel de Los Soles* in Venezuela.

m.   In or about 2015, following the agreement between MADURO MOROS and MARÍN ARANGO regarding the provision of weapons and other equipment, members of the *Cártel de Los Soles* diverted Venezuelan military equipment to the FARC. CABELLO RONDÓN personally participated in the delivery of machineguns, ammunition, and rocket launchers to the FARC at a military base in

14

Venezuela.    During  the  delivery,  CABELLO  RONDÓN  and  others
discussed  the  fact  that  the  weapons  were  a  partial  payment  for
cocaine  that  the  FARC  had  provided  to  members  of  the  *Cártel de Los
Soles*.

    n.    Between  in  or  about  October  2015  and  in  or
about  November  2015,  Efrain  Campo  Flores  and  Franqui  Francisco
Flores  de  Freitas  -- two  relatives  of  MADURO  MOROS  --  agreed  during
recorded  meetings  with  DEA  confidential  sources  to  dispatch  multi-
hundred-kilogram   cocaine   shipments   from   MADURO   MOROS's
"presidential  hangar"  at  the  Maiquetía  Airport.    During  recorded
meetings  with  the  sources,  Campo  Flores  and  Flores  de  Freitas
explained  that  they  were  at  "war"  with  the  United  States,  described
the  *Cártel de Los Soles*,  discussed  a  connection  to  a  "commander
for  the  FARC"  who  was  "supposedly  high-ranked,"  and  indicated  that
they  were  seeking  to  raise  $20  million  in  drug  proceeds  to  support
a  campaign  by  the  Venezuelan  first  lady  --  and  wife  of  MADURO  MOROS
--  in  connection  with  a  late-2015  election  for  the  Venezuelan
National  Assembly.    Campo  Flores  referred  to  MADURO  MOROS  as  his
"father,"  and  stated  that  "what  we  want  is  for  him  to  take  control
again  of  the  .  .  .  National  Assembly."    Flores  de  Freitas  joked
that  "any  opposing  candidate  who  comes  out  and  starts  to  become  a
pest  .  .  .  three  or  four  have  already  been  locked  up."    In  November
2016,  Campo  Flores  and  Flores  de  Freitas  were  convicted  at  trial

15

in the Southern District of New York of conspiring to import cocaine into the United States.

        o.   In or about 2017, MADURO MOROS continued to work with and direct other members of the *Cártel de Los Soles* to dispatch large cocaine shipments to the United States. Specifically, CABELLO RONDÓN and other members of the *Cártel de Los Soles* facilitated air shipments of ton quantities of cocaine to clandestine airstrips in Venezuela's Barinas State. Uniformed FARC personnel armed with machineguns and other weapons helped receive the cocaine in Barinas and loaded the drugs into vehicles with secret compartments to be transported toward the Venezuelan coast for further distribution.

        p.   Beginning in or about 2017, after purporting to negotiate peace agreements with the Colombian government on behalf of the FARC in or about 2016, HERNÁNDEZ SOLARTE agreed to provide a multi-ton quantity of cocaine to DEA confidential sources so that the drugs could be imported into the United States. The sources purported to work for Rafael Caro Quintero, a Mexican drug trafficker who participated in the 1985 torture and murder of DEA Agent Enrique "Kiki" Camarena. During a recorded meeting, HERNÁNDEZ SOLARTE referred to the murder of Camarena by characterizing Caro Quintero as the person who had killed the "son of the bitch of the DEA."

q.   In or about June 2018, Colombian authorities provisionally arrested HERNÁNDEZ SOLARTE, at the request of the United States Attorney's Office for the Southern District of New York, based on a cocaine-importation conspiracy charge in this District related to HERNÁNDEZ SOLARTE's agreement with DEA confidential sources to provide large quantities of cocaine for importation into the United States in or about 2017 and 2018. HERNÁNDEZ SOLARTE was subsequently released, however, and is a fugitive as of the filing of this Superseding Indictment.

r.   In or about July 2019, MADURO MOROS and CABELLO RONDÓN attended a videotaped press conference at which MADURO MOROS announced that the FARC, and in particular MARÍN ARANGO and HERNÁNDEZ SOLARTE, are welcome in Venezuela.

s.   In August 2019, MARÍN ARANGO, standing near HERNÁNDEZ SOLARTE, announced in a videotaped statement that the FARC was beginning a "new phase" of its "armed struggle." MARÍN ARANGO characterized this "struggle" as a "continuation of the rebel fight."

### STATUTORY ALLEGATIONS

16.   From at least in or about 1999, up to and including in or about 2020, in an offense begun and committed out of the jurisdiction of any particular State or district of the United States, including in Venezuela, Colombia, Mexico, Iran, Syria,

Lebanon, and elsewhere, NICOLÁS MADURO MOROS, DIOSDADO CABELLO RONDÓN, HUGO ARMANDO CARVAJAL BARRIOS, a/k/a "El Pollo," CLÍVER ANTONIO ALCALÁ CORDONES, LUCIANO MARÍN ARANGO, a/k/a "Ivan Marquez," and SEUXIS PAUCIS HERNÁNDEZ SOLARTE, a/k/a "Jesús Santrich," the defendants, and others known and unknown, at least one of whom will be first brought to and arrested in the Southern District of New York, intentionally and knowingly combined, conspired, confederated, and agreed together and with each other to violate Title 21, United States Code, Section 960a.

17. It was a part and an object of the conspiracy that NICOLÁS MADURO MOROS, DIOSDADO CABELLO RONDÓN, HUGO ARMANDO CARVAJAL BARRIOS, a/k/a "El Pollo," CLÍVER ANTONIO ALCALÁ CORDONES, LUCIANO MARÍN ARANGO, a/k/a "Ivan Marquez," and SEUXIS PAUCIS HERNÁNDEZ SOLARTE, a/k/a "Jesús Santrich," the defendants, and others known and unknown, would and did engage in conduct that would be punishable under Title 21, United States Code, Section 841(a) if committed within the jurisdiction of the United States, to wit, the distribution of, and possession with the intent to distribute, five kilograms and more of mixtures and substances containing a detectable amount of cocaine, knowing and intending to provide, directly and indirectly, something of pecuniary value to a person and organization that has engaged and engages in terrorism and terrorist activity, to wit, the FARC (which has been

18

designated by the United States Secretary of State as a foreign
terrorist organization pursuant to Section 219 of the Immigration
and Nationality Act and remains so designated) and its members,
operatives, and associates, having knowledge that such
organization and persons have engaged and engage in terrorism and
terrorist activity, in violation of Title 21, United States Code,
Section 960a.

> (Title 21, United States Code, Section 960a; and
> Title 18, United States Code, Section 3238.)

## COUNT TWO
### (Cocaine Importation Conspiracy)

The Grand Jury further charges:

18.   Paragraphs 1 through 15 of this Superseding
Indictment are realleged and incorporated by reference as though
fully set forth herein.

19.   From at least in or about 1999, up to and including
in or about 2020, in an offense begun and committed out of the
jurisdiction of any particular State or district of the United
States, including in Venezuela, Colombia, Mexico, Iran, Syria,
Lebanon, and elsewhere, NICOLÁS MADURO MOROS, DIOSDADO CABELLO
RONDÓN, HUGO ARMANDO CARVAJAL BARRIOS, a/k/a "El Pollo," CLÍVER
ANTONIO ALCALÁ CORDONES, LUCIANO MARÍN ARANGO, a/k/a "Ivan
Marquez," and SEUXIS PAUCIS HERNÁNDEZ SOLARTE, a/k/a "Jesús
Santrich," the defendants, and others known and unknown, at least

one of whom will be first brought to and arrested in the Southern District of New York, intentionally and knowingly combined, conspired, confederated, and agreed together and with each other to violate provisions of Title 21, United States Code, Chapter 13, Subchapter II.

20. It was a part and an object of the conspiracy that NICOLÁS MADURO MOROS, DIOSDADO CABELLO RONDÓN, HUGO ARMANDO CARVAJAL BARRIOS, a/k/a "El Pollo," CLÍVER ANTONIO ALCALÁ CORDONES, LUCIANO MARÍN ARANGO, a/k/a "Ivan Marquez," and SEUXIS PAUCIS HERNÁNDEZ SOLARTE, a/k/a "Jesús Santrich," the defendants, and others known and unknown, would and did import into the United States from a place outside thereof a controlled substance, in violation of Title 21, United States Code, Sections 952(a) and 960(a)(1).

21. It was further a part and an object of the conspiracy that NICOLÁS MADURO MOROS, DIOSDADO CABELLO RONDÓN, HUGO ARMANDO CARVAJAL BARRIOS, a/k/a "El Pollo," CLÍVER ANTONIO ALCALÁ CORDONES, LUCIANO MARÍN ARANGO, a/k/a "Ivan Marquez," and SEUXIS PAUCIS HERNÁNDEZ SOLARTE, a/k/a "Jesús Santrich," the defendants, and others known and unknown, would and did manufacture, distribute, and possess with intent to distribute a controlled substance, intending, knowing, and having reasonable cause to believe that such substance would be unlawfully imported

20

into the United States and into waters within a distance of 12 miles of the coast of the United States, in violation of Title 21, United States Code, Sections 959(a) and 960(a)(3).

22.  It was further a part and an object of the conspiracy that NICOLÁS MADURO MOROS, DIOSDADO CABELLO RONDÓN, HUGO ARMANDO CARVAJAL BARRIOS, a/k/a "El Pollo," CLÍVER ANTONIO ALCALÁ CORDONES, LUCIANO MARÍN ARANGO, a/k/a "Ivan Marquez," and SEUXIS PAUCIS HERNÁNDEZ SOLARTE, a/k/a "Jesús Santrich," the defendants, and others known and unknown, would and did, on board an aircraft registered in the United States, manufacture, distribute, and possess with intent to distribute a controlled substance, in violation of Title 21, United States Code, Sections 959(c) and 960(a)(3).

23.  The controlled substance that NICOLÁS MADURO MOROS, DIOSDADO CABELLO RONDÓN, HUGO ARMANDO CARVAJAL BARRIOS, a/k/a "El Pollo," CLÍVER ANTONIO ALCALÁ CORDONES, LUCIANO MARÍN ARANGO, a/k/a "Ivan Marquez," and SEUXIS PAUCIS HERNÁNDEZ SOLARTE, a/k/a "Jesús Santrich," the defendants, conspired to (i) import into the United States and into the customs territory of the United States from a place outside thereof, (ii) manufacture and distribute, intending, knowing, and having reasonable cause to believe that such substance would be unlawfully imported into the United States and into waters within a distance of 12 miles of the coast of the

21

United States from a place outside thereof, and (iii) manufacture, distribute, and possess on board an aircraft registered in the United States, was five kilograms and more of mixtures and substances containing a detectable amount of cocaine, in violation of Title 21, United States Code, Section 960(b)(1)(B).

(Title 21, United States Code, Section 963; and
Title 18, United States Code, Section 3238.)

## COUNT THREE
### (Possession of Machineguns and Destructive Devices)

The Grand Jury further charges:

24. Paragraphs 1 through 15 of this Superseding Indictment are realleged and incorporated by reference as though fully set forth herein.

25. From at least in or about 1999, up to and including in or about 2020, in an offense begun and committed out of the jurisdiction of any particular State or district of the United States, including in Venezuela, Colombia, Mexico, Iran, Syria, Lebanon, and elsewhere, and for which at least one of two or more joint offenders will be first brought to and arrested in the Southern District of New York, NICOLÁS MADURO MOROS, DIOSDADO CABELLO RONDÓN, HUGO ARMANDO CARVAJAL BARRIOS, a/k/a "El Pollo," CLÍVER ANTONIO ALCALÁ CORDONES, LUCIANO MARÍN ARANGO, a/k/a "Ivan Marquez," and SEUXIS PAUCIS HERNÁNDEZ SOLARTE, a/k/a "Jesús

Santrich," the defendants, during and in relation to a drug trafficking crime for which they may be prosecuted in a court of the United States, to wit, the controlled substance offenses charged in Counts One and Two of this Superseding Indictment, knowingly used and carried firearms, and, in furtherance of such crime, knowingly possessed firearms, and aided and abetted the use, carrying, and possession of firearms, to wit, machineguns that were capable of automatically shooting more than one shot, without manual reloading, by a single function of the trigger, as well as destructive devices.

(Title 18, United States Code,
Sections 924(c)(1)(A), 924(c)(1)(B)(ii), 3238, and 2.)

## COUNT FOUR
### (Conspiracy to Possess Machineguns and Destructive Devices)

The Grand Jury further charges:

26. Paragraphs 1 through 15 of this Superseding Indictment are realleged and incorporated by reference as though fully set forth herein.

27. From at least in or about 1999, up to and including in or about 2020, in an offense begun and committed out of the jurisdiction of any particular State or district of the United States, including in Venezuela, Colombia, Mexico, Iran, Syria, Lebanon, and elsewhere, NICOLÁS MADURO MOROS, DIOSDADO CABELLO

RONDÓN, HUGO ARMANDO CARVAJAL BARRIOS, a/k/a "El Pollo," CLÍVER ANTONIO ALCALÁ CORDONES, LUCIANO MARÍN ARANGO, a/k/a "Ivan Marquez," and SEUXIS PAUCIS HERNÁNDEZ SOLARTE, a/k/a "Jesús Santrich," the defendants, and others known and unknown, at least one of whom will be first brought to and arrested in the Southern District of New York, intentionally and knowingly combined, conspired, confederated, and agreed together and with each other to violate Title 18, United States Code, Section 924(c).

28. It was a part and an object of the conspiracy that NICOLÁS MADURO MOROS, DIOSDADO CABELLO RONDÓN, HUGO ARMANDO CARVAJAL BARRIOS, a/k/a "El Pollo," CLÍVER ANTONIO ALCALÁ CORDONES, LUCIANO MARÍN ARANGO, a/k/a "Ivan Marquez," and SEUXIS PAUCIS HERNÁNDEZ SOLARTE, a/k/a "Jesús Santrich," the defendants, and others known and unknown, would and did, during and in relation to a drug trafficking crime for which they may be prosecuted in a court of the United States, to wit, the controlled substance offenses charged in Counts One and Two of this Superseding Indictment, use and carry firearms, and, in furtherance of such drug trafficking crime, possess firearms, including machineguns that were capable of automatically shooting more than one shot, without manual reloading, by a single function of the trigger, as well as destructive devices, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(i) and 924(c)(1)(B)(ii).

24

(Title 18, United States Code, Sections 924(o) and 3238.)

## FORFEITURE ALLEGATION
### (As to Counts One and Two)

29. As a result of committing the controlled substance offenses charged in Counts One and Two of this Superseding Indictment, NICOLÁS MADURO MOROS, DIOSDADO CABELLO RONDÓN, HUGO ARMANDO CARVAJAL BARRIOS, a/k/a "El Pollo," CLÍVER ANTONIO ALCALÁ CORDONES, LUCIANO MARÍN ARANGO, a/k/a "Ivan Marquez," and SEUXIS PAUCIS HERNÁNDEZ SOLARTE, a/k/a "Jesús Santrich," the defendants, shall forfeit to the United States, pursuant to Title 21, United States Code, Sections 853 and 970, any and all property constituting, or derived from, any proceeds the defendants obtained, directly or indirectly, as a result of the offenses, and any and all property used, or intended to be used, in any manner or part, to commit, and to facilitate the commission of, the offenses charged in Counts One and Two of this Superseding Indictment.

## FORFEITURE ALLEGATION
### (As to Counts Three and Four)

30. As a result of committing the firearms offenses charged in Counts Three and Four of this Superseding Indictment, NICOLÁS MADURO MOROS, DIOSDADO CABELLO RONDÓN, HUGO ARMANDO CARVAJAL BARRIOS, a/k/a "El Pollo," CLÍVER ANTONIO ALCALÁ CORDONES, LUCIANO MARÍN ARANGO, a/k/a "Ivan Marquez," and SEUXIS

PAUCIS HERNÁNDEZ SOLARTE, a/k/a "Jesús Santrich," the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 924(d), all firearms and ammunition involved in and used in the commission of the offenses charged in Counts Three and Four of this Superseding Indictment.

<u>Substitute Assets Provision</u>

31.    If any of the above-described forfeitable property, as a result of any act or omission of NICOLÁS MADURO MOROS, DIOSDADO CABELLO RONDÓN, HUGO ARMANDO CARVAJAL BARRIOS, a/k/a "El Pollo," CLÍVER ANTONIO ALCALÁ CORDONES, LUCIANO MARÍN ARANGO, a/k/a "Ivan Marquez," and SEUXIS PAUCIS HERNÁNDEZ SOLARTE, a/k/a "Jesús Santrich," the defendants:

> a.    cannot be located upon the exercise of due diligence;
>
> b.    has been transferred or sold to, or deposited with, a third person;
>
> c.    has been placed beyond the jurisdiction of the Court;
>
> d.    has been substantially diminished in value; or
>
> e.    has been commingled with other property which cannot be subdivided without difficulty,

it is the intent of the United States, pursuant to Title 21, United States Code, Sections 853(p) and 970, and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendants up to the value of the above forfeitable property.

(Title 21, United States Code, Sections 853 & 970; and
Title 28, United States Code, Section 2461(c).)

FOREPERSON

GEOFFREY S. BERMAN
United States Attorney

28

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

NICOLÁS MADURO MOROS,
DIOSDADO CABELLO RONDÓN,
HUGO ARMANDO CARVAJAL BARRIOS,
a/k/a "El Pollo,"
CLÍVER ANTONIO ALCALÁ CORDONES,
LUCIANO MARÍN ARANGO,
a/k/a "Ivan Marquez," and
SEUXIS PAUCIS HERNÁNDEZ SOLARTE,
a/k/a "Jesús Santrich,"

Defendants.

SUPERSEDING INDICTMENT

S2 11 Cr. 205 (AKH)

(21 U.S.C. §§ 960a, 963; and
18 U.S.C. §§ 924, 3238, 2.)

GEOFFREY S. BERMAN
United States Attorney.

A TRUE BILL

*Angella Bucco Dpty* Foreperson.

3/5/2020

Filed Indictment under seal
Arrest warrants issued

USMJ FOX